## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:    **KAREN JENSEN** | : | **Chapter 13** |
| | : | |
| **Debtor** | : | **Bky. No. 04-34567ELF** |
| | : | |
| _____ | : | |
| | : | |
| **KAREN F. JENSEN,** | : | |
| **WILLIAM C. MILLER, Trustee** | : | |
| **Plaintiffs** | : | **Adv. No. 05-0530** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES A. FROIO and OPTION ONE** | : | |
| **MORTGAGE CORPORATION,** | : | |
| | : | |
| **Defendants** | : | |
| _____ | : | |

# O P I N I O N

**BY:  ERIC L. FRANK,  U.S.  BANKRUPTCY JUDGE**

## I. INTRODUCTION

This case came before the court for confirmation of the chapter 13 plan filed by Karen L.

Jensen ("the Debtor").  The Debtor's brother, James Froio ("James") -- a creditor who did not

file a timely proof of claim – is the sole remaining objector to his sister's plan.  James asserts

both good faith and feasibility objections to confirmation.  At bottom, his position is animated by

his conviction that the Debtor is not among the individuals whom Congress intended be

permitted to obtain a fresh start through the bankruptcy process.  Characterizing the Debtor as a

"high-end retailer's best friend," he argues that his sister's "determination to experience the good

life without the requisite resources" resulted in frenetic spending and the mismanagement of her

own as well as her mother's finances -- practices he contends were carried out at his expense and are indicia of bad faith warranting the denial of confirmation.[1]  He also urges the court to find that the Debtor's chapter 13 plan is not confirmable because certain provisions lack feasibility and, indeed, constitute "pure fantasy."[2]

Consolidated with confirmation was a hearing on the chapter 13 Trustee's Motions to Dismiss this case and trial of an adversary proceeding the Debtor initiated against James, docketed at Adv. No. 05-530 ("the Adversary Proceeding").  In the Adversary Proceeding, the Debtor has requested a determination that she is the sole owner of her home in Haverford, Pennsylvania ("the Booth Lane Property"),[3] notwithstanding the fact that she and James are both listed as co-owners on the recorded deed and accompanying mortgage.  The Debtor's chapter 13 plan envisions a refinancing or sale of the home to generate funds to satisfy, in part, the claims of the Debtor's creditors.  Thus, the identity of the "true" owner or owners of the property affects the Debtor's ability to implement her plan.[4]

The contested matter arising from the objections to confirmation and the Adversary Proceeding  regarding ownership rights in the Debtor's residence require that I resolve issues concerning "party in interest" standing for the purposes of objecting to plan confirmation, the

---

[1]  James Froio Memorandum of Law at 3; James Froio Reply Memorandum of Law at 5.

[2]  James Froio Memorandum of Law at 4.

[3]  The full property address is 5 Booth Lane, No. 6, Haverford, PA 19041.

[4]  The Debtor seeks alternative remedies in the Adversary Proceeding, either: (1) a determination that she is the sole owner of the Booth Lane Property, or (2) if James is determined to share any ownership interest with her, permission to sell the Booth Lane Property pursuant to 11 U.S.C. §363(h).

application of the resulting trust doctrine in Pennsylvania and the meaning of "good faith" in the

chapter 13 confirmation context.

As detailed below, I conclude that:

> (1) The Trustee's Motions to Dismiss will be denied.

> (2) James holds title in the Booth Lane Property in a resulting trust in the Debtor's favor and the Debtor is the sole beneficial owner of that property.

> (3) James has standing to object to the confirmation of the Debtor's chapter 13 plan on the grounds that the plan does not satisfy the requirements of 11 U.S.C. §1325(a)(3) and (6).

> (4) James' objections to confirmation will be overruled.

> (5) Nonetheless, the Debtor's plan cannot be confirmed because it does not comply with 11 U.S.C. §1325(a)(4).

> (6) The Debtor will be granted leave to file an amended plan to cure the §1325(a)(4) defect.[5]

## II.  BACKGROUND

### A.  The Debtor's Family History

Before reviewing the Debtor's chapter 13 plan, the objections James has asserted

to confirmation of that plan and the dispute between the Debtor and James that gave rise to the

Adversary Proceeding, it is helpful to review the Debtor's family history.  The disputes before

me all arise from this history and, in particular, the Debtor's handling of the financial affairs of

her mother, Anne Froio ("Mrs. Froio").

---

[5]  This Opinion constitutes my findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052(a).

The Debtor, a widow, currently resides in the Booth Lane Property, a five-bedroom townhouse. Also living in the property are with the Debtor's son Andrew (aged 16), daughter Lauren (aged 21), and 58-year-old brother Steven Froio ("Steven").[6] (N.T., 2/12/07, 66, 84-86, 167, 192 ).

The Debtor purchased the Booth Lane Property approximately five years ago, signing a mortgage and taking title to the property jointly with James, a brother with whom she does not live and with whom she has subsequently developed a fractious relationship.[7] Beneficial ownership of this property -- the Debtor's main asset in her bankruptcy -- is a matter of dispute between the Debtor and James and is the subject of the Adversary Proceeding. Additionally, as stated earlier, James objects to the confirmation of his sister's chapter 13 plan.

For many years, the Debtor's mother, Mrs. Froio (now age 86), also lived with the Debtor, both at the Booth Lane Property and at a prior address.  (N.T., 2/12/07, 63, 66).  Mrs. Froio began living with her daughter in 1994 when Mrs. Froio was approximately 74 years old.[8] (N.T., 2/12/07, 63, 74).  The Debtor assisted her mother with bathing, medications, meals and the tasks of daily living.  (N.T., 2/12/07, 66).  A former English teacher, Mrs. Froio receives a pension as well as Social Security benefits.  (N.T., 2/12/07, 72).  With Mrs. Froio's approval, the

---

[6]   At the time of the February 12, 2007 confirmation hearing, Steven was employed as a salesman for Piazza Volkswagen and Acura in Ardmore, Pennsylvania.  (N.T., 2/12/07, 193, 211).  Between 1984 and 2002, Steven had no full time employment.  (N.T., 2/12/07, 208).

[7]  The Debtor has three brothers.  Steven Froio lives in her household.  James Froio lives in Maryland. (N.T., 2/12/07, 255).  A third brother, Vincent Froio, lives in California.  (N.T., 2/12/07, 74).

[8]  The Jensen/Froio family began living together at an address on Orchard Way in Merion, Pennsylvania.  The Debtor, her now deceased husband, Andrew, Lauren, Mrs. Froio and the Debtor's grandmother lived at the Orchard Way address.  (N.T., 2/12/07, 63-64).

4

Jensen/Froio family established a practice of pooling their financial resources, including Mrs.

Froio's income, to meet household expenses. (N.T., 2/12/07, 81-82).[9]  With respect to this

income, Mrs. Froio's intended that "[w]e live on it, as a family."  (N.T., 12/8/06, 76).

Mrs. Froio's health declined over the years.  She has been diagnosed with

Parkinson's disease[10] and macular degeneration.  By the time she came to live at the Booth Lane

Property in 2002, she was blind.  (N.T., 2/12/07, 66).  In 2003, Mrs. Froio entrusted the Debtor

with a power of attorney that included, among other things, authority to manage Mrs. Froio's

finances.

In June 2004, Mrs. Froio's health worsened to the point that she became a resident

of the Mary J. Drexel nursing facility ("Mary Drexel").  (N.T., 2/12/07, 68-69).  While the

Debtor's expectations in 2004 were that Mrs. Froio's health would improve sufficiently to permit

her to rejoin the family at the Booth Lane Property, Mrs. Froio continues to reside at Mary

Drexel today.  (N.T., 2/12/07, 71).

Problematically, despite Mrs. Froio's change in residence, the Debtor continued

the practice of pooling the Jensen/Froio income to meet household expenses and did not pay the

bill for Mrs. Froio's care at Mary Drexel.  This led Mary Drexel to file a state court lawsuit

---

[9]    While the Debtor testified that she first began living with her mother in June 1994, she
also testified that she and her mother have been pooling financial resources since 1989. (N.T. 81,
155).  It is not clear what accounts for the difference in these two dates – e.g., did the Debtor and
her mother begin pooling resources when they began living together and if so, is either the 1994
or 1989 date a matter of mis-speaking?  Resolution of that issue is not, however, important to my
decision as to confirmation or as to the related adversary between the Debtor and James.

[10]    Deborah DeSimone, a registered nurse who previously oversaw Mrs. Froio's nursing
care, testified at the confirmation hearing that Parkinson's disease affects motor movement and
the ability to maintain balance.  (N.T., 12/8/06, 64-65).  It can impact swallowing, as well as the
ability to walk across a room or comb one's hair.  (N.T., 12/8/06, 64-65).

5

against the Debtor, Mrs. Froio and her three brothers ("the State Court Collection Action"),

seeking to hold them liable for paying for the care Mary Drexel rendered to Mrs. Froio.[11]  Mary

Drexel based the State Court Collection Action against the Debtor and her three brothers on, <u>inter</u>

<u>alia</u>, a Pennsylvania statute that requires children to pay for the care and maintenance of their

indigent parents.[12]  <u>See</u> 62 Pa. Stat. Ann §1973, repealed 2005 Pa. Laws 196, No. 43, §3 (July 7,

2005); 23 Pa.Cons. Stat. Ann. §4603 (enacted July 7, 2005).

    In addition to caring for Mrs. Froio, the Debtor has also been committed to the

care of her daughter Lauren, who has special needs.  Lauren has been diagnosed with obsessive

compulsive disorder, borderline personality disorder, social anxiety disorder, agoraphobia and

depression.  (N.T., 2/12/07, 176-77).   Her medical and psychiatric conditions require distinctive

care.[13]  Lauren's agoraphobia is of such severity that she rarely leaves home.[14]  Her agoraphobia

has also placed restrictions on the Debtor's ability to embark upon her career as a tutor full-

---

    [11]   <u>See</u> <u>Mary J. Drexel Home v. Froio, et al.</u>,  No. 05-16832 (C.P. Mtgy.).

    [12]  In the Complaint, Mary Drexel also included counts for breach of contract, breach of
implied contract, quantum meruit, breach of fiduciary duty, negligent misrepresentation,
misrepresentation, negligence, conversion and fraud relating to the failure to pay for Mrs. Froio's
stay at Mary Drexel.

    [13]  Among other things, Lauren testified that her medical condition requires her to eat a
specialized diet of certain organic foods comprised of specific concentrated amounts of fiber and
minerals and that one of her psychiatric compulsions is that her food must be kept separate from
the family's.  (N.T., 2/12/07, 184-85).  The Jensens spend approximately $300 to $400 a month
for Lauren's food.  (N.T., 2/12/07, 187).

    [14]  The Debtor home schooled Lauren since Lauren was 12.  (N.T., 2/12/07, 190). The
Debtor and Lauren testified that the February 12, 2007 confirmation hearing was the first time
Lauren had been out of her home in a significant period of time.  (N.T., 2/12/07, 66, 176).

6

time.[15]  The Debtor assists Lauren with bathing, food preparation and most other aspects of daily living.  (N.T., 2/12/07, 177).  Lauren's medical bills have averaged $500 a month.  (N.T., 2/12/07, 184).

In addition to caring for her children and Mrs. Froio, the Debtor has also provided her brother Steven, with whom she currently lives, financial assistance over the years.  Steven, who was unemployed for several years, testified that the Debtor loaned him a total of $30,000 between July 2002 and November 2004 to help him meet his living expenses.  (N.T., 2/12/07, 195).

Against this backdrop, and facing the threat of foreclosure proceedings against the Booth Lane Property due to a substantial delinquency on the mortgage, see Part C., infra, the Debtor filed her chapter 13 petition on November 1, 2004.[16]

_____

[15]  The Debtor is certified in Spanish, English and reading and specializes as a tutor for the Scholastic Aptitude Test ("SAT").  (N.T., 2/12/07, 323-24).  She testified that Lauren often struggles with permitting her mother to leave the house and also has issues with having strangers come into the house.  (N.T., 2/12/07, 323)

[16]  In August of 2006, Mrs. Froio filed her own chapter 13 petition in this court.  In re Anne Froio, Bky. No. 06-13498 (Bankr. E.D. Pa.).  That case was converted to chapter 7 in March 2007.  In that case, Mrs. Froio filed an adversary proceeding against Mary Drexel asserting that Mary Drexel violated the automatic stay.  See Froio v. The Mary J. Drexel Home, Adv. No. 06-0463 (Bankr. E.D. Pa.).  The hearing in that adversary proceeding was consolidated with the Debtor's confirmation hearing and trial of the adversary proceeding between the Debtor and James.  A ruling in Adv. No. 06-0463 will be issued at a later date.

7

## B.  The Debtor's Assets

The Debtor's home, the Booth Lane Property, is the main asset in this bankruptcy case.[17]  In the schedules the Debtor filed on November 11, 2004, she valued the Booth Lane Property at $570,000.  (See Schedule A).  There was testimony at the confirmation hearing about a neighboring town home, of potentially lesser value,[18] selling for $700,000, albeit, in a "unique situation."[19]  (N.T., 2/12/07, 87). The Debtor purchased the Booth Lane Property in 2002 for $563,000.  (N.T., 2/12/07, 61-62).

## C.  The Debtor's Liabilities

In addition to being her main asset, the Booth Lane Property is also the source of the Debtor's largest and only secured debt.[20]  Option One Mortgage Corporation ("Option One"),

---

[17]  According to the Debtor's schedules, her other assets include $26,000 in personal property, $24,000 of which the Debtor attributed to a 2004 Chrysler Sebring that she has since surrendered post-petition, leaving a remaining value of $2,000.  (See Schedule B).

I may take judicial notice of the docket in this case and the content of the bankruptcy schedules for the purpose of ascertaining the timing and status of events and facts not reasonably in dispute.  See Fed. R. Evid. 201;  In re Scholl, No. 97-32805 DWS, 1998 WL 546607 (Bankr. E.D. Pa. Aug. 26, 1998).

[18]  Unlike the neighboring property, the Debtor's town home includes fireplaces and an attached table in the kitchen.  (N.T., 2/12/07, 87-88).

[19]  The Debtor testified that the neighboring property was purchased by a particularly motivated buyer who was "desperate" to obtain one of the townhomes on Booth Lane, having written letters to all of the owners of the Booth Lane homes expressing a desire to buy.  (N.T., 2/12/07, 87).  The Debtor believes the buyer paid above the asking price in cash for the neighboring property.  (N.T., 2/12/07, 87).

[20]  In the schedules she filed on November 11, 2004, the Debtor also disclosed Daimler Chrysler ("Chrysler") as a secured creditor with respect to the 2004 Chrysler Sebring referenced above.  Although the Debtor did not amend her schedule of secured creditors following her post-

8

the company that financed the mortgage on the Booth Lane Property, has filed a proof of claim

for $488,854.33, including $57,587.36 in arrearages.  Preventing foreclosure on the Booth Lane

Property was the Debtor' primary motivation for filing for bankruptcy protection.  (N.T., 2/12/07,

48).

Besides the Option One debt, the Debtor has also disclosed 16 creditors (some of

which she designated "disputed") holding unsecured, nonpriority claims, for a total unsecured

debt of $179,301.17.  (See Amended Schedule F).  This includes a $20,000 personal loan from

her brother James (See Schedule F, filed 11/21/04) and $106,978.87 based on a default judgment

Mary Drexel obtained post-petition against the Debtor in the State Court Collection Action.  (See

Amended Schedule F, filed 11/8/05).  Some time subsequent to the Debtor's disclosure of the

Mary Drexel post-petition judgment, the judgment was vacated.[21]  The Debtor has not disclosed

any creditors with unsecured priority claims.  (See Schedule E).


D.  **The Debtor's Income and Expenses**

On the Current Income schedule the Debtor filed on November 11, 2004, she

stated that she had been self-employed as a tutor for four months and that her monthly income

---

petition surrender of the Sebring, she states in the chapter 13 plan that she seeks to confirm that
she presumes that the repossession of this vehicle satisfies any and all obligations to Chrysler.

[21]   A bankruptcy court may take judicial notice of matters of record in the state courts
within its jurisdiction.  E.g., In re Soto, 221 B.R. 343, 347 (Bankr. E.D. Pa. 1998).  The docket in
the State Court Collection Action reveals that the default judgment that had been entered in this
case against the Debtor was vacated on March 20, 2007.  See Mary J. Drexel Home v. Froio, et
al., No. 05-16832 (C.P. Mtgy.) (Docket Entry No. 32).  Presumably, Mary Drexel concluded that
the judgment was entered after the commencement of this bankruptcy case and in violation of the
automatic stay, 11 U.S.C. §362(a).

was $2,600.  (See Schedule I, 11/11/04).  To that figure, she added Social Security ($2,692) and

pension income ($90.36)[22] and $2,000 for "Mother's Contribution to Household" to arrive at

total combined monthly income of $7,382.36.  (See id.).

On October 28, 2005, she amended her Current Income schedule, subtracting her

personal monthly income of $2,600 (she stated that she was employed seasonally and was "ready

to begin again") and deleting Mrs. Froio's contributions to household.  (See Amended Schedule

I, 10/28/05).

On February 7, 2007, the Debtor submitted a second amended Current Income

schedule, again apparently designed to update her financial situation (rather than correct

historical data concerning her income as of the date of her petition).   In the Amended Schedule I

filed on February 7, 2007, the Debtor disclosed that she is unemployed and that her Social

Security income has been reduced to $1,440.[23]  The Debtor also added back in "Mother's

Contribution to Household" of $2,000 to arrive at a total monthly income of $3,440.  Against this

figure, her Amended Schedule J discloses current monthly expenditures of $3,380.  (See

Amended Schedule J).[24]

---

[22]  The Social Security income and pension income referenced in Schedule I is derived
from benefits attributable to the employment of the Debtor's late husband.

[23]   The Debtor testified that her social security income was reduced effective January
2004 because her son reached the age of sixteen (16).  (N.T., 2/12/07, 51).

[24]   The Debtor filed an Amended Schedule J on February 7, 2007.  That schedule
discloses the following monthly expenses: $1,270 in utility costs (electricity, water, sewer,
telephone and cable), $600 for food, $100 for clothing, $700 for medical and dental expenses,
$300 for a condo fee, $100 for homeowner's insurance, $150 for transportation and the
remainder for home repair/upkeep, recreation and other miscellaneous expenses.  See Amended
Schedule J (2/7/07).  The Debtor makes no allowance for rent or home mortgage expenses.

10

## E.  The Debtor's Seventh Amended Chapter 13 Plan

The chapter 13 plan the Debtor has submitted for confirmation – i.e., the Seventh

Amended Chapter 13 Plan ("the 7th Amended Plan") –  is the eighth plan she has filed with the

court.  While the Debtor's initial plan envisioned a scenario whereby the Debtor would retain and

continue to make payments on the debts secured by the Booth Lane Property and her Chrysler

Sebring, by the time the Debtor filed her Third Amended Plan on March 14, 2006, she was

committed to trying to refinance or sell the Booth Lane Property and had surrendered the

automobile.   Except with respect to minor variations in the payment amounts to be made to the

Trustee, the terms of her plans subsequent to the Second Amended Plan have not differed

materially.

The 7th Amended Plan:

1.  Requires that she pay the Trustee $750 a month through February 2007 and
    $50 thereafter until the Booth Lane Property is sold or refinanced, at which
    time payments will cease, or for the remaining 10 months of the plan,
    beginning in March 2007.

2.  Provides that, within 60 days after confirmation, the Debtor will refinance the
    mortgage on the Booth Lane Property in her name name only, relieving James of his
    co-indebtedness on the mortgage, and paying off Option One in full.  In
    consideration for her brother's agreement to and cooperation in this
    transaction, the Debtor proposes to pay her brother $20,000 from the proceeds
    of the refinancing.[25]

3.  Provides that, in the event the Debtor cannot accomplish a refinancing, within
    180 days after confirmation of a plan, the Debtor and her brother James shall
    sign an agreement of sale for the Booth Lane Property for not less than
    $600,000, "with half the proceeds to be distributed to the estate of the Debtor
    and half to be distributed according to the outcome of [the adversary involving

---

[25]   As is discussed further below, see infra III.C., this provision of the plan is problematic
given that James never filed a proof of claim in this case and does not have a beneficial
ownership interest in the Booth Lane Property.

the Debtor and her brother's rights to the Booth Lane Property]."  The
proceeds are expected to be sufficient to pay Option One in full.

4.  Provides that, if an agreement to sell the Booth Lane Property is not signed
within 180 days from the date of confirmation, the Debtor's case will be
subject to dismissal upon the motion of any interested party.

5.  Classifies claimants into five groups:

   a.  Class One priority claims are administrative expenses, which the
   Debtor expects to consist of the Trustee's commissions and attorneys'
   fees.

   b.  Class Two secured claims consist of Option One's mortgage claim on
   the Booth Lane Property.

   c.  Class Three claims include the claims of Gene Mitchell and Edward
   Abel, two creditors who had judicial liens that the Debtor avoided in
   this bankruptcy.

   d.  Class Four is defined to encompass Chrysler whose claims the Debtor
   assumes are satisfied by the surrender of the Sebring.

   e.  Class Five includes all other allowed claims.

6.  Provides for payment of Class One and Two claims in full from the sale or
refinancing of the Booth Lane Property and for the pro rata payment of Class
Three and Five claims in full, if proceeds so permit.

See Debtor's 7th Amended Chapter 13 Plan (filed 2/12/07).

**F.  Filing of Claims**

The §341 creditors' meeting was held and concluded on January 5, 2005.  The

deadline for filing proofs of claim was April 5, 2005 ("the Bar Date").  See Rule 3002(c).  As of

May 31, 2007, the claims register for this case reflects the following:

12

Case 04-34567-elf   Doc 158   Filed 06/11/07   Entered 06/11/07 14:52:55   Desc Main
Document    Page 13 of 48

### Secured Claims Filed on or Prior to the Bar Date

| | |
|---|---|
| Option One | $488,854.33 |
| Daimler Chrysler | 30,783.64[26] |
| Gene Mitchell | 10,286.99 |
| Edward J. Abel | 2,198.13[27] |

### Unsecured Claims Filed on or Prior to the Bar Date

| | |
|---|---|
| Joseph T. Matson | $ 1,010.00 |
| IRS | 8,601.43 |
| Saltz, Polisher, P.C. | 4,594.83 |
| Shihidah Carpets | 1,144.70 |
| Jefferson Capital Systems | 728.55 |
| PECO Energy | 10,662.21 |
| First Staff Nursing Services | 1,856.88 |
| Interstate Fleets | 6,630.31 |
| **Total** | **$ 35,228.91**[28] |

### Unsecured Claim Filed After the Bar Date

| | |
|---|---|
| Mary Drexel | $ 28,302.71[29] |

---

[26] The Daimler Chrysler claim was secured by the automobile the Debtor surrendered postpetition. The Plan provides for the surrender of the automobile in full satisfaction of this secured claim.

[27] The claims of Mitchell and Abel were secured by judicial liens that the Debtor avoided. The Plan categorizes these claims as Class Three claims and states that the claimants are entitled to a pro rata distribution along with the Class Five claims.

[28] The total of the timely filed general unsecured claims is $47,714.03. However, the Debtor has filed objections to the claims of Saltz Polisher, Jefferson Capital, First Staffing Nursing, and Interstate Fleets. Those objections have not yet been heard.

[29] Although Mary Drexel's claim was filed after the Bar Date, Mary Drexel was not scheduled by the Debtor until seven (7) months after the Bar Date had passed. While the Debtor initially objected to Mary Drexel's claim on timeliness grounds and on the merits, the Debtor has subsequently withdrawn her objection to Mary Drexel's claim. Thereafter, Mary Drexel filed another proof of claim for a lower amount ($19,500). Although the later proof of claim does not expressly state that it amends the prior claim, I understand that to be Mary Drexel's intention.

**G.  The Trustee's Motions to Dismiss**

      The Trustee filed a Motion to Dismiss this case on four (4) occasions: (1) February 11, 2005 (asserting a failure to provide required documentation as to income and/or property valuation and/or insurance coverage); (2) March 14, 2005 (asserting a failure to provide income documentation and payments to the Trustee); (3) April 18, 2005 (asserting a failure to file a Certificate of Business of Debtor and lack of plan feasibility); and (4) August 30, 2005 (asserting a failure to file monthly operating reports) (collectively, "the Motions").

      By the February 12, 2007 confirmation hearing, however, the Debtor's counsel told the court that the Debtor had either satisfied the Trustee's concerns (by rectifying the missed payments to the Trustee that had been mailed by the Debtor's counsel, but lost in the mail)[30] or that they were no longer applicable given the Debtor's lack of current employment.  The Trustee did not disagree with the Debtor's counsel and presented no evidence at the confirmation hearing in support of the Motions.  Accordingly, I will deny the Motions.

**H.  The Confirmation Hearing and Trial of the Adversary Proceeding**

      The confirmation hearing took place on December 8, 2006, and February 12, 2007.[31]

---

      Additionally, whereas Mary Drexel was once an objector to the confirmation of the Debtor's plan and participated at the confirmation hearings, Mary Drexel withdrew its objections concurrent with the Debtor's withdrawal of her objection to Mary Drexel's claim.

    [30]  See Ex. D-5 (December 11, 2006 letter from the Debtor's counsel to the Trustee, William C. Miller, enclosing money orders for $100 and $150).

    [31]  Mrs. Froio's testimony commenced on in court on  December 8, 2006, but was not completed on that date. By agreement, on January 4, 2007, the parties took the deposition of Mrs. Froio at the Mary Drexel facility as the means of completing her testimony. The deposition transcript was admitted into evidence as Exhibit MDH-6.

Trial of the Adversary Proceeding concerning ownership of the Booth Lane Property was consolidated with the confirmation hearing. The Debtor and James both offered witnesses and documentary evidence in support of their positions.[32]

## I. James Froio's Objections to the Confirmation of the 7th Amended Plan

The Debtor listed her brother James as a creditor on Schedule F of her original bankruptcy schedules filed on November 11, 2004. The docket reflects that he was served with notice of the §341 hearing on December 18, 2004. See Docket Entry No. 14. That notice informed him of the April 5, 2005 Bar Date. Id.

James was served with the Complaint in the Adversary Proceeding by first class mail on August 25, 2005. He filed an Answer to the Complaint on October 7, 2005.[33] He has participated actively in the main bankruptcy case since November 21, 2005, when he filed Objections to the Debtor's Amended Chapter 13 Plan. Notwithstanding, James never filed a proof of claim.

James' objections to confirmation of the Debtor's plan are that the plan:

- improperly divests him of his share of the Booth Lane Property;

- is infeasible;

---

[32]  Mary Drexel also offered witnesses and documentary evidence at the confirmation hearing but, as noted above, subsequently withdrew its objections to confirmation.

[33]  Option One is also named as a defendant in the Adversary Proceeding. However, only James Froio filed an answer to the amended complaint and presented testimony at the trial of the Adversary Proceeding. I also note that the Debtor named the chapter 13 Trustee as a plaintiff in the adversary case. The Trustee has not participated in the Adversary Proceeding and there is no indication that he intended or desired to be a plaintiff in the proceeding. I do not pass on the propriety of the Debtor's action in naming the Trustee as a party plaintiff.

15

- seeks to discharge an existing debt to Mary Drexel for services provided to Mrs. Froio and makes no future provision for the care of Mrs. Froio;[34] and

- was not filed in good faith.[35]

  In support of these asserted legal conclusions, James contends that the Debtor

---

[34]   This objection is not framed in a manner that I find cognizable as an objection to confirmation under 11 U.S.C. §1325.  In any event, James' concern regarding the payment of monies owed to Mary Drexel for care provided to Mrs. Froio stems, in part, from the fact that he is a co-defendant with the Debtor and his brothers in the State Court Collection Action that Mary Drexel filed and faces liability for payment of that debt.  Since James asserted this objection, however, certain events have transpired that may eliminate, or at least mitigate, James' financial exposure.

   First, the Debtor has withdrawn her objection to Mary Drexel's claim, and the Trustee has asserted no objection to the allowance of the claim. Therefore, if the Booth Lane Property is refinanced or sold as the Debtor contemplates, there should be a distribution to Mary Drexel.

   Second, in April 2007, upon agreement of the parties, the court lifted the stay in Mrs. Froio's bankruptcy to permit Mary Drexel to petition the state court for the appointment of a financial guardian, which is intended to cut off the Debtor's future control over her mother's finances.   See In re Anne Froio, No. 06-13498 (Bankr. E.D. Pa.) (Order Entered April 2, 2007) (Docket Entry No. 57).

   Finally, JoAnn Adams, a former case work supervisor at the Pennsylvania Department of Public Welfare, testified about the denial of certain of the public assistance applications the Debtor filed for Mrs. Froio's care because the Debtor failed to attach all requisite paperwork and was unable to attend at least one office interview.  The Debtor stated that the "office interview" conflicted with her care for her daughter, Lauren.  Ms. Adams testified that an appeal is still pending that could potentially grant retroactive public assistance benefits to Mrs. Froio covering her care at Mary Drexel extending back to November 1, 2005.  (N.T., 2/12/07, 230-245).  In a subsequent conference with the court held on May 25, 2007, Mary Drexel's counsel reported that retroactive benefits have been approved.

[35]   I include within the broad category of good faith objections James' contentions that (1) the Debtor misappropriated money from Mrs. Froio and failed to apply that money toward the debt owed to Mary Drexel and (2) that as a result of the Debtor's alleged misappropriation of her mother's funds, James may face enhanced civil liability to Mary Drexel.  See James Froio's Objection to 7th Amended Plan at ¶¶ 5-10.

16

misappropriated income from Mrs. Froio that should have been used to pay Mary Drexel, thereby

exposing him to potential liability in the State Court Collection Action and that the Debtor has

also exposed him to liability with respect to the Booth Lane Property mortgage.

**J.   Summary of the Evidence Presented at the Confirmation Hearing and Trial of the
Adversary Proceeding**

With these objections and resolution of the adversary at issue, the testimony at the

confirmation hearing and adversary necessarily focused heavily on the provisions of the 7th

Amended Plan, the Debtor's spending practices, her handling of Mrs. Froio's finances, the non-

payment of Mary Drexel's prepetition bills, the circumstances leading up to the purchase of the

Booth Lane Property and the reasons for the inclusion of James' name on the mortgage and deed.

**1.   Testimony with Respect to the 7th Amended Plan**

The Debtor testified that she intends to pay her administrative expenses, secured

creditor (Option One), and, on a pro rata basis, those creditors holding allowed, unsecured

nonpriority claims.  The primary source of these payments will be the net proceeds from the sale

or refinancing of the Booth Lane Property, plus the modest monthly payments the Debtor has and

will continue to make to the Trustee.

The Debtor said she first started discussing the possibility of refinancing her existing

mortgage with finance companies in January 2006.  (N.T., 2/12/07, 52-53).  She stated that one

particular company, Franklin Financial, has a program that would permit her to "buy down" her

debt, re-establish credit and relieve her brother, James, from his obligation on the mortgage.

17

(N.T., 2/12/07, 53).[36]  She testified that if she accomplished a refinancing, she would like to use

$20,000 of the proceeds to repay a personal loan she received from her brother James.  (N.T.,

2/12/07, 53).[37]

     If the Debtor cannot accomplish a refinancing, then within 180 days of confirmation,

she intends to sign an agreement of sale for the Booth Lane Property.  (N.T., 2/12/07, 56).  She

believes that an adjudication of the Adversary Proceeding that she filed against James is needed

to accomplish this goal as the Adversary Proceeding will define ownership rights in the Booth

Lane Property and, if necessary, provide authorization for the refinance or sale transaction.[38]

     With respect to the pre-petition bills from Mary Drexel for Mrs. Froio's care, the

---

[36]  She testified that she did not refinance the Option One mortgage prior to filing for
bankruptcy because her brother James' cooperation was necessary to effect the refinancing and
he had not cooperated in the refinancing process.  (N.T., 2/12/07, 54).

[37]  The Debtor's testimony with respect to this $20,000 was inconsistent.  At times, she
characterizes the $20,000 as money she "owed" to her brother James for amounts loaned (see
N.T., 2/12/07, 53) and at times she testified that her brother gifted her the money, that "it was not
a loan" and it was not her "understanding that [she] owed this money to [her] brother. (N.T.,
2/12/07, 132).  Either way, it is obvious that she feels some obligation, either legal or moral, to
repay this money to her brother.

    Although he never filed a proof of claim, James Froio also contended at the hearing
that the Debtor owes him $20,000 for money he loaned her.  (N.T., 2/12/07, 263).  James stated
that he loaned the Jensens approximately $7,000 to prevent foreclosure on Mrs. Froio's house in
Merion, loaned the Debtor $800 to $1,000 for her husband's funeral, approximately $7,000 to
$8,000 for funeral expenses and an additional $5,000 to live on until she received the insurance
proceeds related to her husband's death.  (N.T., 2/12/07, 264).

    As discussed, infra at III.C, the provision of the Debtor's plan providing for repayment
of $20,000 to James is problematic.

[38]  The issue whether a chapter 13 debtor has the power to invoke 11 U.S.C. §363(h) has
not been raised by James.  See 11 U.S.C. §1303 (authorizing the debtor to assert the powers of a
trustee under 11 U.S.C. §§363(b), (d), (e), (f) and (l)).

18

Debtor's plan makes provision for the payment of unsecured, allowed claims.  The Debtor has

withdrawn her earlier objection to Mary Drexel's claim and the Trustee has not objected to its

allowance.  Mary Drexel will therefore be accorded Class Five treatment and is entitled to

receive a distribution along with other creditors who hold allowed unsecured claims.

As to her current source of income, the Debtor testified that she receives Social

Security benefits – i.e., survivor's benefits on account of a minor child, her son, Andrew.  She

has also applied for new Social Security benefits for Lauren, who is considered a disabled adult,

and is awaiting a ruling on that application.  (N.T., 2/12/07, 155).  Additionally, the Debtor plans

to resume tutoring, for which she typically receives $100 to $125 an hour.  (N.T., 2/12/07, 323).

### 2.  Testimony With Respect to the Debtor's Financial Management

The Debtor testified at some length concerning the way in which she managed her own

and Mrs. Froio's finances prior to filing her bankruptcy petition in November 2004.

James' counsel questioned the Debtor's spending practices and financial management,

particularly in 2003, one year prior to the filing of her bankruptcy petition.  The Debtor's accounts

reflected recurring overdraft and insufficient fund charges.  (N.T., 2/12/07, 125-26).  Additionally,

the Debtor conceded that she had received approximately $36,000 in July 2003 following the sale

of the Orchard Way property and that by the end of September 2003, had less than $800 left in her

account.  (N.T., 2/12/07, 93-97).  The Debtor also admitted to having made several purchases

from her account in August and September of 2003 at luxury retailers.[39]   The Debtor testified that

_____

[39]   For example, the Debtor's bank account reflects seven (7) purchases from Louis
Vuitton in these two months.  (see Ex. JF-3, at 8/14/03 for $475.50, 8/21/03 for $475.50, 8/22/03
for 1,022.90, 8/25/03 for $30, 8/25/03 for $1,037.90, 9/4/03 for $1000.50, 9/23/03 for

19

she made some of these purchases for friends and was reimbursed for the purchases.  (see, e.g., N.T., 2/12/07, at 101).[40]  Finally, James' counsel also questioned the Debtor's judgment in choosing a $1,000 a month rental car during the pendency of her bankruptcy following the surrender of her Chrysler Sebring.  (N.T., 2/12/07, 119-20).[41]  The Debtor testified that she required the use of a car, could not afford to buy one, and that her brother, Steven, with whom she lives, actually bore the cost of the rental car, having reimbursed her in cash for the amount she paid in lieu of paying her rent.  (N.T., 2/12/07, 120-21, 151).  Steven corroborated the Debtor's testimony on this point.  (N.T., 2/12/07, at 193-95).

The Debtor also was questioned about how she handled her mother's income.  The Debtor testified that she and her mother have been pooling financial resources since 1989.  (N.T., 2/12/07, 81).  Mrs. Froio similarly testified that she intended for her income to be pooled with the Jensen income and used for the family's combined expenses.  (N.T., 12/8/06, 76, 78).  Mrs. Froio said she gave the Debtor her power of attorney so that the Debtor can do what she thinks is right.  (N.T., 1/4/07, 10).  Essentially, Mrs. Froio stated that she was completely satisfied with her

---

$1,779.40).

[40]   In addition to these purchases, the Debtor admitted to having made purchases for personal and household use at Bed Bath and Beyond, Sam Goody, Strawbridge's, Nordstrom's, Bloomingdale's, Saks Fifth Avenue and other local retailers.  (N.T., 2/12/07, at 102-03).

[41]   Specifically, he contended, as he stated in his post-trial briefing, that, "[w]hile [James drove] a battered old rattletrap that hemorrhages oil because he cannot get a loan to replace it despite his respectable, steady income, Debtor has tooled around the Main Line in new Lexuses and Cadillacs at a cost of $700-$1,000 per month."  James Froio Memorandum of Law at 3.

daughter's judgment in using the income under her control for the benefit of the family.[42]

### 3.   Testimony with Respect to the Booth Lane Property Ownership and Payment of the Mortgage in "Year Two"

Several witnesses – the Debtor, Andrew Froio, Lauren Froio, Steven and James – testified about the circumstances leading up to and following the purchase of the Booth Lane Property, testimony relevant to the Adversary Proceeding the Debtor filed to define the ownership rights of James and the Debtor concerning the property.

The Debtor testified that, following her husband's death in December 2001, she found it traumatic to continue living in the Orchard Way home in which he passed away.  (N.T., 2/12/07, 76).  She first looked at places to rent before deciding to purchase a home in an attempt to gain equity in a property.  (N.T., 2/12/07, 76).  She obtained approximately $360,000 in insurance proceeds related to her husband's death.  However, she had not worked outside the home for several years.  (N.T., 2/12/07, 77).  She needed someone to help her secure a mortgage.  (N.T., 2/12/07, 76-77).  Eventually, James agreed to assist his sister by jointly applying for financing.  In effect, the Debtor and James agreed that James would "lend" the Debtor his credit rating by appearing jointly with her on the mortgage and the title, while the Debtor would put up all of the money for the property.  (N.T., 2/12/07, 77).  The Debtor did not intend James to have any beneficial interest in the Booth Lane Property.  (N.T., 2/12/07, 79).

---

[42]   Q. So basically, anything your daughter does with your money is all right with you?

A.  Yes

(N.T., 1/4/07, 16).

21

The Booth Lane Property was purchased for $563,000.  (N.T., 2/12/07, 62).  The Debtor paid the entire down payment and closing costs on the Booth Lane Property, totaling approximately $150,000.  (N.T., 2/12/07, 77).  The Debtor also made mortgage payments through December 2003.  (N.T., 2/12/07, 79).  When the mortgage was first paid, it was paid out of a joint account titled in the name of both the Debtor and James.  (N.T., 2/12/07, 127, 273).  However, James did not contribute any of the money placed in the joint account.[43]  The Debtor also was solely responsible for making repairs and upgrades to the property.  (N.T., 2/12/07, 80).  These improvements and upgrades include the installation of a chair lift to permit Mrs. Froio to ambulate the stairs, (N.T., 2/12/07, 67), and the addition of fireplaces and a built-in table in the kitchen.  (N.T., 2/12/07, 88).

James' testimony and the Debtor's testimony concerning their respective intentions with respect to the beneficial ownership of the Booth Lane Property were consistent in all material respects.  James testified that the Debtor told him in the spring of 2002, that she wanted to move from the Orchard Way property.  (N.T., 2/12/07, 265).  James says the Debtor asked him if he would assist her in obtaining a mortgage because she had no credit history, a prior bankruptcy and no recent employment.  (N.T., 2/12/07, 265).  James agreed to assist his sister.  (N.T., 2/12/07, 267).  James acknowledged that by doing so, he did not intend to obtain any beneficial ownership in the Booth Lane Property.  (N.T., 2/12/07, 267).  He never made any mortgage payments.  (N.T., 2/12/07, 289).  Additionally, whereas James took a mortgage deduction on his federal income taxes one year, he provided the refund check to the Debtor.  (N.T., 2/12/07, 275).

---

[43]   I infer this fact from James' testimony that he did not pay anything to Option One. (N.T., 2/12/07, 288-89).

Significantly,  the parties' testimony diverged only with respect to how the mortgage was to be paid after the first year of monthly payments ("Year Two").  The Debtor testified that James had offered to pick up the mortgage payments in 2003 (i.e., in Year Two) and did not do so. (N.T., 2/12/07, 78).  She testified that instead, he breached his promise to her and told her, in 2003, that if she could not make the mortgage payments, she should put the Booth Lane Property up for sale.  (N.T., 2/12/07, 78-79).  Andrew, Lauren and Steven Froio all testified that they were present during conversations between the Debtor and James with respect to the purchase of the Booth Lane Property and that they heard James agree to be responsible for paying the mortgage in Year Two.  (N.T., 2/12/07, 170, 175, 181, 203).

In contrast, James testified that he and the Debtor agreed that after two (2) years, she would take over the mortgage herself and, if she did not have the necessary income, she would sell the property.  (N.T., 2/12/07, 266-67).  He denied that he ever agreed to pay the mortgage. (N.T., 2/12/07, 268).  In fact, he lost his job during the month the Booth Lane Property was purchased.  (N.T., 2/12/07, 269-70).  Finally, he testified that there were no other witnesses to his discussions with the Debtor about buying the Booth Lane Property – the conversations were not conducted in person, but by telephone.  (N.T., 2/12/07, 268).

James also testified about the harm he contends the Debtor has caused him.  James is employed as a database administrator for the Department of Justice where he requires security or top security clearances to continue his work or to branch into doing work for the Army.  (N.T., 2/12/07, 258-59).  James testified that in the Fall of 2003, he had security clearance withheld because of nonpayment of the debt he owes as co-obligor on the Option One mortgage on the Booth Lane Property.  (N.T., 2/12/07, 259).  If his current application for top secret clearance is

23

denied, James stated that he will have to leave his current position and job opportunities will be

limited.  (N.T., 2/12/07, 262).  James has also been named as a defendant in the Mary Drexel State

Court Collection Action.  (N.T., 2/12/07, 284-85).  James testified that because the Debtor has

caused him "considerable damage," he believes he deserves compensation in the form of profits

from the sale of the Booth Lane Property.  (N.T., 2/12/07, 292, 307, 308).


## III.  DISCUSSION

Section 1325(a) of the Bankruptcy Code requires a bankruptcy court to confirm a

proposed chapter 13 plan if the six criteria set forth in that subsection are satisfied.  See 11 U.S.C.

§1325(a);[44] In re Norwood, 178 B.R. 683, 686 (Bankr. E.D. Pa. 1995).

James has raised good faith and other objections to the confirmation of the Debtor's

plan.  However, at the confirmation hearing and again in post-hearing briefing, the Debtor has

argued that James lacks standing to object to her plan because he did not file a proof of claim.

Therefore, as a threshold issue, I must consider whether James has standing be heard with respect

to confirmation.

---

[44]  Section 1325 was amended by the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005).  The provision
now sets forth nine (9) criteria for mandatory confirmation of a chapter 13 plan, but the new
subsections apply only to cases filed on or after October 17, 2005.  This bankruptcy was filed
prior to the effective date of §1325 as amended by BAPCPA. Therefore, I refer to §1325(a) in its
pre-BAPCPA form.

A.  <u>Standing</u>

Section 1324 of the Bankruptcy Code says that any "party in interest" may object to

the confirmation of a chapter 13 plan.  11 U.S.C. §1324.  The Code does not define this term, but

courts in this district have generally construed it to include anyone "whose pecuniary interest is

directly affected by the bankruptcy proceeding."  <u>See</u> <u>In re Kressler</u>, 2001 WL 919860, at *2 (E.D.

Pa. Aug. 9, 2001) (citing <u>In re Aronson</u>, 1994 WL 497541, at *6 (E.D. Pa. Sept. 12, 1994)), <u>aff'd</u>,

40 Fed. Appx. 712, 2002 WL 1723885 (3d Cir. July 25, 2002) (non-precedential opinion).  The

Court of Appeals has instructed that courts must determine whether an entity or individual is a

"party in interest" on a case by case basis.  <u>In re Amatex</u>, 755 F.2d 1034, 1042 (3d Cir. 1985) (in

chapter 11 context).


1.  <u>James Froio's Standing</u>

There are at least two potential bases upon which to find that James has standing to

object to confirmation  – (1) as owner of an asserted half interest in the Booth Lane Property,

proceeds from the sale or refinancing of which are expected to pay the lion's share of the Debtor's

disclosed liabilities and (2) as an unsecured creditor with unfiled claims arising from four (4)

distinct sources: (a) damages arising from the Debtor's breach of the alleged promise to refinance

the Booth Lane Property mortgage in Year Two; (b) potential claims against the Debtor arising

from his status as a co-obligor on the Option One mortgage;[45] (c) the alleged $20,000 personal

loan; and (d) his exposure to liability in the Mary Drexel State Court Collection Action as a result

---

[45]  <u>See generally</u> <u>Matter of M. Frenville Co., Inc.</u>, 744 F.2d 332, 337 (3d Cir. 1984)
(discussing whether and when a right of contribution ripens sufficiently to be treated as a
bankruptcy "claim"), <u>cert. denied</u>, 469 U.S. 1160, 105 S.Ct. 911 (1985).

of the Debtor's alleged, prepetition mishandling of her mother's funds.

### a. James Froio's Asserted Rights as an Alleged Co-Owner in the Booth Lane Property

James argues that he has standing to object to confirmation of the Debtor's plan

because he is the beneficial co-owner of real property – i.e., the Booth Lane Property -- that the

Debtor intends to sell or refinance to pay her disclosed debts.  The Debtor disputes that James has

any ownership interest in the Booth Lane Property.  The Debtor contends that James holds only

bare legal title in the Booth Lane Property  – i.e., that James holds his share of title subject to a

resulting trust for his sister's benefit.

Generally speaking, nonbankruptcy law defines the nature, scope and extent of

property rights that become part of the bankruptcy estate.  See Butner v. United States, 440 U.S.

48, 55, 99 S.Ct. 914, 918 (1979).  To determine whether James holds title in the Booth Lane

Property subject to a resulting trust in favor of the Debtor, I apply Pennsylvania law.  See In re

Stewart, 2007 WL 1300736, at *3 & n.9 (Bankr. E.D. Pa. May 3, 2007) (citing In re Orion

Refining Corp., 341 B.R. 476 (Bankr. D. Del. 2006)).

Pennsylvania has adopted the Restatement (Second) of Trusts §440 (American Law

Institute 1959) ("Restatement 2d") with respect to purchase-money resulting trusts.  See, e.g.,

Masgai v. Masgai, 460 Pa. 453, 458, 333 A.2d 861, 864 (1975); Purman v. Johnston, 343 Pa. 647,

649, 22 A.2d 722, 723-4 (1941).  Via this doctrine, Pennsylvania courts infer that where one party

provides consideration for the purchase of land legally held by another, the purchaser intended the

purchase to inure to his or her own benefit and that there is some other reason that title was placed

26

in the name of another.  "This rule is based upon an inference that the 'purchaser does not intend

that the transferee should have the beneficial interest in the property, but that the purchaser

himself shall have the beneficial interest.'"  Masgai, 460 Pa. at 458, 333 A.2d at 864 (quoting

Restatement 2d, Introductory Note to Topic 4, at 391).  A purchase-money resulting trust does not

arise, however, if the person who paid the purchase price manifests an intention that no resulting

trust arise.  Masgai, 460 Pa. at 458, 333 A.2d at 864.

Recognition of a purchase-money resulting trust effectuates what the law presumes to

have been the parties' intentions in the circumstances – i.e., that the person to whom the land was

conveyed holds title as a trustee for the person who paid for the property.  Consequently, courts

focus on two essential elements in analyzing purported purchase-money resulting trusts: (1) the

payment of consideration and (2) the intention of the person furnishing the consideration at the

time of the conveyance.

The party seeking to establish a resulting trust has the burden of proving the facts

alleged to give rise to such a trust.  This burden of proof is exacting – the law requires clear,

direct, precise and convincing evidence.  See, e.g., Masgai, 460 Pa. at 460, 333 A.2d at 865;

Fenderson v. Fenderson, 454 Pa. Super. 412, 423, 685 A.2d 600, 605 (1996); Mermon v.

Mermon, 257 Pa. Super. 228, 234, 390 A.2d 796, 799 (1978).  Once a party claiming a resulting

trust meets the initial burden of showing that she paid consideration at the time of purchase the

burden of going forward then shifts to the holder/grantee of the property's legal title who must

rebut the presumption that it was the payor's intention that the grantee hold title for the payor's

benefit.  See Restatement 2d §441.

Based upon the record in this case, and applying the heightened standard of proof, I

27

find that the Debtor has met her burden in establishing a resulting trust and that James has not

rebutted the evidence that supports such a trust.

The evidence regarding the Debtor's intentions at the time the Booth Lane Property

was purchased is unequivocal.  While the Debtor and James may disagree with respect to whether

James had offered to gift mortgage payments to the Debtor in Year Two, they do not disagree with

respect to the initial intentions in purchasing the property.  See Mermon, 257 Pa. Super. at 234,

390 A.2d at 798 ("it is the intention of the payor at the time of the transfer and not at some

subsequent time which determines whether a resulting trust arises") (citing Restatement 2d §443,

Comment a., at 404).  Both the Debtor and James intended that the Debtor have full beneficial

interest in the property and that James have no beneficial interest.   (N.T., 2/12/07, 79, 267).[46]

James "loaned" his credit rating as an accommodation to the Debtor to help her obtain a

mortgage.  (N.T., 2/12/07, 76-77, 265-67 ).  For that same reason, his name was included on title

to the home.  The Debtor paid the down payment, the closing costs and any mortgage payments

that have been made.  (N.T., 2/12/07, 77).  James did not advance or pay any money with respect

---

[46]    In his Post-Trial Reply Brief, James Froio argues that "the clear intent of Debtor and J.
Froio, upon purchasing the Haverford property, was that they would share ownership."  Froio
Reply Brief, at 4.  No such evidence of intent was presented at the confirmation hearing.  As
discussed above, both the Debtor and James Froio testified that the Debtor alone was to hold
beneficial ownership of the Booth Lane Property.  James Froio's testimony, in particular, was
that:

> I was taking [out the mortgage on the Booth Lane Property] for her
> and her family.  I was doing – I was really extending myself and
> putting myself at risk for them . . . .  I didn't benefit from it.  I
> wasn't going to benefit from it.  I was agreeing to put myself
> at risk so that she could take, get herself a nice home . . . .  I didn't
> want any profit from that house.

(N.T., 2/12/07, 267).

to the Booth Lane Property.  (N.T., 2/12/07, 77 ).[47]

The Debtor's and James' subsequent behavior lends further support to this conclusion. Following the purchase of the Booth Lane Property, the Debtor lived there with her family, made improvements to the property (she added fireplaces, a built-in table and a chair lift) and was solely responsible for home repairs.  James lived elsewhere and made no financial contributions to the upkeep or repair of the property.  Nor did he pay the mortgage.  Additionally, while James claimed a deduction on his income taxes for the Booth Lane mortgage, he provided the refund he received from that income tax return to his sister.

I am mindful of the presumption under Pennsylvania law that arises when a payor takes title to property in her name and in the name of another jointly  − i.e., the presumption that it was the payor's intention to make a beneficial gift of an undivided interest in the property to the joint title holder.  See Masgai, 460 Pa. at 459, 333 A.2d at 864.  However, this presumption can be rebutted by evidence of a "different intention."  Masgai, 460 Pa. at 459-60, 333 A.2d at 864. The clear, decisive and unequivocal testimony was that the Debtor had no intention to make a gift to her brother.

Based on this evidence, I conclude that James holds his share of title to the Booth Lane

---

[47]   There was testimony that the initial mortgage payments were made from an account that was titled in the names of James Froio and the Debtor, jointly.  However, there was no evidence that James contributed any money to this account and his unequivocal testimony was that he paid no money towards the purchase of the Booth Lane Property or in repayment of the Option One mortgage.  (N.T., 2/12/07, 289).  Further, I credit James' testimony that he did not even promise to make any payments on the mortgage in Year Two. Thus, the Booth Lane Property was purchased in a transaction in which all of the consideration was paid by one party (the Debtor) and title to the property was placed, in part, in the name of another (James).  As a result, this case falls within the contours of the Restatement 2d §440.

Property subject to a resulting trust for the Debtor's benefit.  James holds no beneficial ownership

interest in the property.  <u>See, e.g.</u>, <u>McHenry v. Stapleton</u>, 443 Pa. 186, 278 A.2d 892 (1971)

(where Stapleton took legal title to property and executed a mortgage because McHenry could not

get a mortgage himself and McHenry made all mortgage payments, paid property taxes and

collected rents and intended to be beneficial owner, Stapleton held title in resulting trust for

McHenry).

Because I conclude that James has no beneficial ownership interest in the Booth Lane

Property, his property rights do not provide a basis upon which to confer standing to object to the

confirmation of the Debtor's plan.  This conclusion also dictates that I grant the Debtor the relief

that she seeks in the Adversary Proceeding: a declaration that she is the sole, beneficial owner of

the Booth Lane Property.

### b.  James Froio As an Unsecured Creditor <br> Who Did Not File A Proof of Claim

James' status as an unsecured creditor who did not file a proof of claim**,** but whose

unasserted claims will be discharged upon confirmation, provides another potential basis for his

standing to object to confirmation of the 7th Amended Plan.[48]  <u>See</u> 11 U.S.C. §1328(a).[49]

The Bankruptcy Code does not define "party in interest" and the reported cases that

---

[48]   The nature of those potential unfiled claims is described in Part III.A.1, <u>supra</u>.

[49]   BAPCPA amended §1328(a) of the Bankruptcy Code and the amended version is
applicable to cases filed on or after October 17, 2005.  The prior version of §1328(a) is
applicable in this case.  <u>See also</u> n.44, <u>supra</u>.

30

seek to define the phrase "party in interest" are not consistent.  Some courts have construed the

term narrowly to include only parties who hold an allowed claim.[50]   Other courts have interpreted

the phrase more broadly.[51]

Another section of the Code, although not directly applicable to chapter 13 cases,

provides guidance in understanding who Congress meant to encompass within the phrase "a party

in interest."  Section 1109 of the Bankruptcy Code governs who has a right to be heard on issues

arising in chapter 11 reorganizations.  That section defines a "party in interest" to include, among

others, a "creditor."  See, e.g., 11 U.S.C. §1109(b) (including "the debtor, the trustee, a creditors'

committee, an equity security holders' committee, a creditor, an equity security holder or any

indenture trustee" in the definition of a "party in interest" with the right to be heard on any issue

in a chapter 11 case).  The Code defines a "creditor" as an entity that has a claim against the

---

[50]   See, e.g., In re Dennis, 230 B.R. 244 (Bankr. D.N.J. 1999) (secured creditor with
disallowed claim is not party in interest with standing to object to plan based on failure to pay its
disallowed claim); In re Sheppard, 173 B.R. 799 (Bankr. N.D. Ga. 1994) (creditor who failed to
file a timely proof of claim lacked standing to object to confirmation or seek dismissal); In re
Stewart, 46 B.R. 73, 75-76 (Bankr. D. Or. 1985) (holding that an unsecured creditor who filed no
proof of claim has no standing to object to confirmation of a chapter 13 plan); see also In re
Aronson, 1994 WL 497541 at *6-7 (creditor ceased to be a party in interest after its claim was
disallowed); In re Gurst, 76 B.R. 985 (Bankr. E.D. Pa. 1987) (withdrawal of proof of claim
eliminated creditor's right to assert objections to confirmation).

[51]   See, e.g., In re B. Cohen & Sons Caterers, Inc., 124 B.R. 642, 645 (E.D. Pa. 1991)
(all of the debtor's creditors are parties in interest and failure to file a proof of claim does not
extinguish that status); In re Armstrong, 303 B.R. 213, 219 (10th Cir. B.A.P. 2004) ("[a] person
need not have filed a proof of claim in order to be a 'party in interest . . . .  [The term] means
all persons whose pecuniary interests are directly affected by the bankruptcy proceedings and
includes anyone who has an interest in the property to be administered and distributed under the
Chapter 13 plan . . . ."); see also In re Stamford Color Photo, Inc., 105 B.R. 204 (Bankr. Conn.
1989) (failure to file a claim eliminates only right to distribution; it does not extinguish creditor
status; the claim remains viable until discharge).

debtor or the estate that arose at the time of or before the order for relief.  11 U.S.C. §101(10).  A

"claim," in turn, is defined as a "right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

legal, equitable, secured or unsecured . . . ."  11 U.S.C. §101(5).  Pursuant to this analysis, James

is a creditor of the Debtor's estate.

In considering the scope of the term "party in interest," I find it significant that

Congress employed that broad term, rather than other, more limiting potential terms, such as

"holder of an allowed claim" or "holder of a filed proof of claim" or "creditor."  As the court

observed in In re Turpen, 218 B.R. 908 (Bankr. N.D. Iowa 1998), in ruling upon "party in

interest" standing in the chapter 13 context:

> In providing who might object to plans, Congress used
> the broad term "party in interest."  It did not restrict the
> filing of objections to creditors who hold allowed claims.
> Contra In re Stewart, 46 B.R. 73, 75 (Bankr. D. Or. 1985).
> Nor does the status of creditor appear to hinge on the
> entity having filed a proof of claim.  If it had so desired,
> Congress could have defined "creditor" in § 101(10) as an
> "entity that has a claim against the debtor that arose at the
> time or before the order for relief concerning the debtor,
> proof of which has been filed."  It did not.  I find no
> requirement in the Code that status as a creditor
> depends on the filing of a claim.  If it were otherwise,
> creditors in Chapter 7 cases could not meaningfully
> participate in no-asset cases without filing claims, even
> though the notice of bankruptcy advises that it is as yet
> unnecessary to file claims.  See Fed. R. Bank. P. 2002(e).
> For example, creditors in no-asset cases could not file
> objections to exemptions without filing proofs of claim.
> Fed. R. Bankr. P. 4003(b).

Id. at 911 (emphasis in original).[52]

I find the Turpen court's analysis generally persuasive, subject to a further qualification. Importantly, "[a]n entity may be [a] real party in interest and have standing in one respect while he may lack standing in another respect." In re Ofty Corp., 44 B.R. 479, 481 (Bankr. D. Del. 1984). Thus, it is possible to conclude that the failure to file a proof of claim has the consequence of placing certain limitations on the arguments a creditor with standing can make without holding that the creditor lacks standing altogether to object to confirmation of a chapter 13 plan. More specifically, given the necessity of holding an "allowed claim" to receive a distribution under a confirmed plan, I find it logical to deny a creditor who has not filed a claim the right to object to confirmation on grounds related to the sufficiency of distribution under 11 U.S.C. §1322(a)(4) and §1325(b), but to permit such a creditor to raise other types of objections to confirmation that are not directly related to adequacy of the proposed distribution.

In this case, that James did not file a proof of claim does not eliminate his current status as a creditor of the Debtor's estate.[53] I find that his status as creditor vests him with a

———————————————

[52]    The Turpen court was called upon to determine whether a creditor must have filed a claim to have standing to object to confirmation of a chapter 13 plan in a district in which the confirmation hearing is held prior to the proof of claim bar date. Turpen, 218 B.R. at 911. The court ultimately found, applying the reasoning quoted above, that the filing of a claim was not prerequisite to standing to object to a chapter 13 plan in those circumstances. Id.

[53]    The court in In re Stamford Color Photo, Inc. followed a similar line of reasoning in analyzing whether a creditor who had not filed a proof of claim in a chapter 11 bankruptcy had standing to move for dismissal of the case. The court stated:

        The debtor argues that since the movant failed to timely file a
        proof of claim, she is not a creditor of the estate and therefore
        lacks standing to move for dismissal. The debtor's contention
        is a nonsequitur. Even assuming that "party in interest," which

33

practical stake in the outcome of this case:  he has a pecuniary interest in ensuring that his claims

against the Debtor are not discharged in a bankruptcy that he contends was not filed in good faith.

As such, James has standing to assert that the 7th Amended Plan has not been filed in good faith,

see 11 U.S.C. §1325(a)(3).  Also, he has standing to object to the feasibility of the 7th Amended

Plan, 11 U.S.C. §1325(a)(6).[54]

---

       is not defined by the Code, is limited to a debtor and creditors,
the movant's status fits within that category [because the
movant satisfies the criteria for a "creditor" set forth in section
101(9)].  Bankruptcy Rule 3003(c)(2) does not extinguish a creditor's
status, it merely eliminates a creditor's right to a distribution if
the creditor has not timely filed a proof of claim. . . .  Indeed, even
if the [movant's] claim would not be excepted from discharge . . .,
the creditor's claim would still have viability until it is discharged.

Id. at 206-207 (citations omitted).

    [54]    Together, the bankruptcy filing, automatic stay and confirmation of a chapter 13 plan
prevent an unsecured creditor from exercising its collection rights under applicable
nonbankruptcy law.  If a debtor's proposed chapter 13 plan is infeasible, then confirmation
should be denied.  Alternatively, confirmation of an infeasible plan will likely result in the debtor
later defaulting on his or her obligations under the plan.  Both scenarios (denial of confirmation
or later default after confirmation) frequently lead to dismissal of a chapter 13 case.  In either
scenario, the eventually-dismissed chapter 13 case may accomplish nothing more than a delay of
the creditor's exercise of its collection rights.  An unsecured creditor who has not filed a claim
should be able to object to confirmation of a proposed plan that cannot meet the feasibility
standard of 11 U.S.C. §1325(a)(6) to avoid the unnecessary delay in exercising its rights under
applicable nonbankruptcy law.  See also 11 U.S.C. §1307(c)(1) (providing for dismissal due to
unreasonable delay "that is prejudicial to creditors").  This is a ground for objection that is
distinct from an objection based on an asserted inadequacy in distribution, see, e.g., id.
§§1325(a)(4) and 1325(b).

**B.**  **Whether the Debtor's Plan was Proposed in Good Faith**

   **1.**  **Legal Principles to be Employed in Evaluating Good Faith**

   To be entitled to confirmation, a chapter 13 plan must have been "proposed in good

faith and not by any means forbidden by law."  11 U.S.C. §1325(a)(3).  "Good faith" is a

pervasive concept in the Bankruptcy Code and plays a role in the determination whether a chapter

13 plan may be confirmed.  As observed in one commentary:

> "Every bankruptcy statute since 1898 has incorporated literally,
> or by judicial interpretation, a standard of good faith for the
> commencement, prosecution, and confirmation of bankruptcy
> proceedings."  Little Creek Dev. Co. v. Commonwealth
> Mortgage Corp., 779 F.2d 1068, 1071 (5th Cir. 1986) (citations
> omitted).  It is said that the good faith requirement "prevents
> abuse of the bankruptcy process by debtors whose overriding
> motive is to delay creditors without benefitting them in any
> way or to achieve reprehensible purposes."  Id. at 1072.
> In other words, to avail oneself of the powerful equitable
> weapons of the Bankruptcy Code, debtors must enter the process
> with clean hands.

Leif M. Clark & Sharron B. Lane, Having Good Faith in Good Faith Analysis, 683 Commercial

Law & Practice Course Handbook Series 669, 676 (1994).

   Nonetheless, the Bankruptcy Code does not define what is meant by "good faith."  Nor

does the legislative history shed any light on its intended meaning.  One commentator suggests

that, "[t]he controversy concerning the chapter 13 'good faith' test has resulted in more litigation

than any other issue to arise since the enactment of the Bankruptcy Code."  Bradley M. Elbein,

The Hole in the Code: Good Faith and Morality in Chapter 13, 34 San Diego L. Rev. 439, 448

(May-June 1997) ("Elbein") (quoting Conrad K. Cyr, The Chapter 13 "Good Faith" Tempest: An

35

Analysis and Proposal For Change, 55 Am. Bankr. L.J. 271, 273 (1981)).[55]

Left with the task of constructing parameters around the amorphous concept of "good faith," courts have considered differing laundry lists of subjective and objective factors as indicia of good or bad faith and have differed  –  at least in the pre-BAPCPA world – with respect to how broadly or narrowly they have defined the relevant conduct that should be included within their scrutiny of good faith.  It is possible to divide the courts which have considered "good faith" objections to confirmation under §1325(a) into two categories: (1)"plan good faith" courts – in which the courts strictly construe the text of §1325(a)(3) and look only to the debtor's good faith or lack of good faith in proposing a plan – and (2) "broad good faith" courts – in which courts look not only to the debtor's conduct in proposing the plan, but also to prepetition conduct, in assessing the debtor's good faith or lack thereof.  Elbein, 24 San Diego L. Rev. at 453-54 (collecting cases).

The Third Circuit has not yet passed upon the scope of the "good faith" language set forth  §1325(a)(3) or the factors that should be assessed in applying §1325(a)(3) scrutiny.[56]  In this case, James' argument is premised on the view that confirmation of a chapter 13 may be denied

---

[55]   This same writer noted that an electronic data search of cases from 1979 through 1996 created a corpus of 738 cases interpreting good faith in chapter 13.  Id. at n. 9.  My own search for cases involving good faith in the chapter 13 context over the past 10 years generated 1,092 cases.

[56]   The Third Circuit has considered and rejected the argument that a chapter 13 plan violates the good faith standard of 11 U.S.C. § 1325(a)(3) merely because it provides for nominal payments to unsecured creditors.  See In re Hines, 723 F.2d 333 (3d Cir. 1983).  However, that issue is not raised in this case.

36

based on a "broad good faith" objection.  I find it unnecessary to resolve this legal issue.[57]  As

explained below, assuming arguendo that the Debtor's prepetition conduct may be considered in

determining an objection to confirmation under §1325(a)(3), I find that the Debtor did not file this

chapter 13 case in bad faith.

In determining the appropriate constructs to employ in deciding the good faith issue in this

case, I have looked for guidance to Third Circuit's decisions on good faith in related contexts.

In the context of a motion to dismiss a chapter case, filed under 11 U.S.C. §1307)(c), the Court of

Appeals has directed the lower courts to examine "good faith" on a case by case basis following a

"totality of circumstances" test that includes consideration of the following circumstances:

> the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's
> motive in filing the petition; how the debtor's actions affected creditors; the debtor's
> treatment of creditors both before and after the petition was filed; and whether the
> debtor has been forthcoming with the bankruptcy court and the creditors.

In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996). Certain courts within this district have also found

these factors to be useful guides in the §1325 context.  See, e.g., In re Devine, 1998 WL 386380,

at *12 (Bankr. E.D. Pa. July 7, 1998) (per Sigmund, J.) (applying Lilley factors to § 1325 analysis

of good faith).

In connection with §1325, the good faith inquiry essentially asks the court to pass

judgment on whether the filing is fundamentally fair in a manner that complies with the spirit of

---

[57]  In light of the enactment of 11 U.S.C. §1325(a)(7) as part of BAPCPA, this judicial
debate may soon be purely academic.  Section 1325(a)(7), which is applicable in cases filed on or
after October 17, 2005, provides that the court shall confirm a plan if "the action of the debtor in
filing the petition was in good faith."

the Bankruptcy Code's provisions. <u>Devine</u>, at *12;[58] <u>accord</u>, <u>In re Smith</u>, 286 F.2d 461, 466 (7th

Cir. 2002).

In the chapter 7 context, the Court of Appeals has cautioned that the dismissal of a

bankruptcy case for lack of good faith should be "confined carefully" and "generally utilized only

in . . . egregious cases  . . . ."[59]  I find the Court of Appeals' instruction regarding the narrow

application of the good faith concept in chapter 7 cases relevant as well in the chapter 13

confirmation context  The dangers inherent in a broad application of the good faith doctrine must

be considered regardless whether the context is dismissal of the entire case or only denial of

confirmation.  Broad application of the good faith doctrine creates a risk of judicial usurpation of

the legislative power to determine the scope of and eligibility for bankruptcy relief in general or

under a particular chapter.  <u>See, e.g.</u>, <u>In re Johnson</u>, 80 B.R. 953, 963  (Bankr. D. Minn. 1987)

(making the same observation in the chapter 7 dismissal context).  There is also the danger that

the court's decision will lapse  into an inquiry that "clothe[s] subjective moral judgments with the

force of law."  <u>Sarasota, Inc. v. Weaver</u>, 2004 WL 2514290, at *4 (E.D. Pa. November 5, 2004)

---

[58]  In <u>In re Lilley</u>, 91 F.3d at 491, the Third Circuit cited with approval the Seventh
Circuit's decision in <u>In re Love</u>, 957, F.2d 1350, 1357 (7th Cir. 1992) (itself quoting several prior
cases and 9 <u>Collier on Bankruptcy</u> ¶9.20, at 319 (14th ed. 1978)), in which the substance of the
good faith plan proposal requirement in chapter 13 cases was explained in the following terms:

> [O]ne of the primary purposes of the good faith evaluation . . . is
> to "force [] the bankruptcy court to examine 'whether or not
> under the circumstances of the case there has been an abuse of the
> provisions, purpose or spirit of [the Chapter] . . . '"

[59]  <u>In re Tamecki</u>, 229 F.3d 205, 207 (3d Cir. 2000) (quoting <u>In re Zick</u>, 931 F.2d 1124,
1129 (6th Cir. 1991) (holding chapter 7 case may be dismissed for cause under 11 U.S.C. §707(a)
for lack of good faith); <u>accord</u>, <u>id.</u>, 229 F.3d at 209 (Rendell, J. dissenting) (observing that other
courts of appeal have narrowly construed bad faith, permitting dismissal in "very limited
circumstances" involving "egregious behavior or misconduct").

(quoting In re Woodman, 287 B.R. 589, 592 (Bankr. D. Me. 2003), aff'd, 2003 WL 23709465 (D.

Me. September 19, 2003) (relating to disposable income test for chapter 13 plan confirmation

under §1325(b)), aff'd, 379 F.3d 1 (1ˢᵗ Cir. 2004).  Consequently, the jurisprudential concerns that

have caused courts to treat dismissal of chapter 7 cases for lack of good faith as "a narrow

doctrine, which should be employed only in extreme cases to protect the integrity of the

bankruptcy system," should be applicable in the chapter 13 confirmation context.[60]

Finally, the respective burdens with respect to good faith objections have been defined

within our circuit.  In this case, James has the initial burden of articulating a clear and cognizable

good faith objection.  Provided he meets that burden, the ultimate burden then shifts to the Debtor

to persuade the court to overrule the objection and confirm the plan.  See In re Fricker, 116 B.R.

431, 438 (Bankr. E.D. Pa. 1990); see also In re Tamecki, 229 F.3d at 207 (articulating burden for

dismissing chapter 7 petition).

It is with these principles in mind that I evaluate James' good faith objection to

confirmation of the 7ᵗʰ Amended Plan in this chapter 13 case.


## 2.  **The Debtor's Prepetition Conduct**

James' good faith objections, while restated in varying ways, essentially focus upon

the Debtor's allegedly extravagant spending habits pre-bankruptcy, her intermingling of Mrs.

---

[60]    In re Glunk, 342 B.R. 717, 732 (Bankr. E.D. Pa. 2006) (citing Tamecki, 229 F.3d at
209).  But see In re Love, 957 F.2d 1350, 1356 (7ᵗʰ Cir. 1992) (the bankruptcy court should be
more reluctant to dismiss a petition under §1307(c) for lack of good faith than to reject a plan for
lack of good faith under §1325(a)).

Froio's funds with her own and the perceived future harms that might obtain if the Debtor

continues to possess a power of attorney with respect to her mother's finances.

James does not mince words in stating his position.  In his Post-Trial Memorandum, he

asserts that from his perspective, the Debtor's bankruptcy is evocative of the adage, "No good

deed goes unpunished."  (Froio Memorandum of Law at 1).  He complains that as his reward for

assisting his sister with purchasing the Booth Lane Property, he earned "a mortgage foreclosure

suit by Option One; a second suit by the Mary J. Drexel Home . . .; a credit rating that is so

devastated that he cannot get a loan to buy a badly needed, modest new car; [and] an ongoing

threat to his employment because the claims against him have endangered his 'secret' clearance

and prevented him from obtaining 'top secret' clearance."  (Froio Memorandum of Law, at 1-2).

I am sympathetic to James' position.  However, much of the detriment he claims to

have suffered results from a garden variety breach of contract  – i.e., breach of the alleged promise

that the Debtor made to refinance or sell the Booth Lane Property within a limited time period

after its purchase.  Thus, the conventional remedy for this injury is the filing of a proof of claim.

James did not pursue that route, but instead chose to present his claims as indicia that the Debtor's

plan was filed in bad faith.  Consequently, I am constrained to review those assertions using the

applicable legal standards for evaluating good faith in the §1325 plan confirmation context and,

ordinarily, the existence of a claim for breach of contract is not a basis for denying confirmation

of a chapter 13 plan.

While the Debtor's poor financial management and spending practices are troubling,

and I do not condone those practices, I find that the Debtor's behavior was the result of bad

judgment, not bad faith.  It must be borne in mind that one of the primary purposes of the

40

bankruptcy discharge is to provide unfortunate debtors with a fresh start from accumulated debt

and that, in providing a mechanism for this fresh start, Congress likely presumed that most, if not

all, debtors who seek bankruptcy relief do so as a result of poor financial management.  See In re

Elmendorf, 345 B.R. 486, 494 (Bankr. S.D.N.Y. 2006) (citations omitted).  If improvident

financial decisions were the litmus for good faith, few debtors might pass.  If courts routinely

denied confirmation to debtors based solely on poor financial management and prepetition

spending beyond their means, without a finding of any additional aggravating factors, the "good

faith" inquiry would swallow the whole and contradict Congressional intent.

As I have previously determined in the Chapter 7 context, for a debtor's spending

habits to take on bad faith significance, ordinarily there must be some additional aggravating

factors at issue, such as the debtor's concealment of assets, falsification of  records, transfer of

assets beyond the reach of creditors or some other behavior designed to interfere with the "orderly

judicial process for resolution of . . . debt."  In re Glunk, 342 B.R. at 736; accord, Tamecki, 229

F.3d 205 at 207   I find this to be equally true with respect to a good faith assessment of chapter

13 plans.

In this case, I do not find any of the aggravating factors to suggest that the Debtor filed

her chapter 13 plan in bad faith.  I do not find that the Debtor ran up debts in contemplation of

bankruptcy.  The Debtor did not conceal assets, engage in dubious transfers of assets, falsify or

destroy books or records, or misstate the amount of her income.  Most importantly, I find that her

plan represents a good faith effort to meet her liabilities with her existing assets and is in the best

interests of both her creditors and her family.  The Debtor's plan to sell her most valuable asset

and devote its non-exempt value to payment of her debts is the most rational solution to the

41

Debtor's problems and offers the best possible outcome for the creditors as well.

With respect to the Debtor's pooling of Mrs. Froio's income with her own, I find that the Debtor and Mrs. Froio had pooled their income for a period of over ten years and did so with Mrs. Froio's knowledge and consent.  While the power of attorney that the Debtor signed in 2003 obligated the Debtor to keep Mrs. Froio's funds separate from her own, I credit the Debtor's testimony that she believed that she was not running afoul of the law in continuing the prior practice of pooling money with Mrs. Froio to meet family expenses (N.T., 2/12/07, 159) and that she believed she acted in furtherance of Mrs. Froio's intentions. The Debtor's impression, although potentially erroneous with respect to her legal obligations as her mother's power of attorney, was subjectively in good faith.[61]

Furthermore, I do not believe that the Debtor's continuation of this practice following Mrs. Froio's 2004 admission to Mary Drexel was part of an effort to thwart her creditors.  Rather, I conclude that the Debtor continued this practice based on the hopes that Mrs. Froio's stay at Mary Drexel would be brief and that she would soon return to the Booth Lane Property with her family.  Finally, as noted above, the stay was lifted in Mrs. Froio's chapter 7 bankruptcy, to permit

---

[61] I acknowledge that the Debtor's use of Mrs. Froio's income to pay family expenses rather than the cost of Mrs. Froio's care at Mary Drexel presented the greatest potential obstacle to confirmation in my mind.  As her mother's attorney-in-fact, the Debtor was a fiduciary.  See 20 Pa C.S. §5601(e).  In using Mrs. Froio's money for the general benefit of the extended family rather than for payment of Mrs. Froio's care at the Mary Drexel facility, the Debtor may have breached that duty. Query whether an attorney-in-fact breaches a fiduciary duty by expending funds in a manner requested by the principal, but possibly not in the principal's best interests?  In evaluating this conduct in the context of an objection to confirmation for lack of good faith, however, there are two mitigating factors: (1) Mrs. Froio's consent and ratification of the Debtor's conduct; and (2) the Debtor's subjective belief that she was authorized to act as she did. Further, based on my observation of Mrs. Froio while she gave in-court testimony, I am satisfied that she was competent to ratify the Debtor's conduct.

Mary Drexel to petition the state court for the appointment of a financial guardian for Mrs. Froio. This should alleviate concerns regarding any future management of Mrs. Froio's income.[62]

In sum, based upon my review of the record, including the witnesses' testimony and post-hearing briefing, I do not find that the Debtor's plan was filed in bad faith or is fundamentally unfair to the Debtor's creditors or that it runs contrary to the spirit of the Bankruptcy Code.[63] To the contrary, I find that in filing this case and proposing a plan the Debtor has acted in good faith and attempted to deal fairly with her outstanding debts.

3.   **Feasibility of the Debtor's 7th Amended Plan**

James also objects to the confirmation of his sister's 7th Amended Plan on the grounds that it is infeasible or, as he puts it, is "pure fantasy." (Froio Memorandum of Law at 4). James observes that the Debtor has not been employed steadily and that her ability to work is limited by

---

[62]   As a result of the expected appointment of a guardian and the parties' separate living arrangements, Mrs. Froio's income should not be considered part of the Debtor's income in Schedule I. While subtracting the $2,000 "Mother's Contribution to Household" from Schedule I would appear on its surface to provide the Debtor with a shortfall when compared to Schedule J expenses, I am not troubled by this difference. The Debtor is nearing the completion of the payments she must make to the Trustee, is planning to resume tutoring and has an application pending for Social Security benefits for Lauren. The amount the Debtor pays to the Trustee – $50 per month – is such that minor belt-tightening should enable the Debtor to make the remaining payments.

[63]   To return to James' construct, I am not sure that the adage "no good deed goes unpunished" is true. I suspect that some good deeds are rewarded and that others have negative consequences for the good Samaritan. In any event, aphorisms are not binding legal principles. To determine whether James will suffer the negative consequences from his good deed, I must apply the principles of law found in the Bankruptcy Code and accompanying decisional law.

43

Lauren's psychological condition and care requirements.  In view of these circumstances, he

contends that no lender would agree to refinance the Booth Lane Property mortgage in the name

of the Debtor alone.

Given the Debtor's limited, current source of income and employment history, I, too,

seriously question whether her goal of refinancing the Booth Lane Property in her name only is

realistic.  Nonetheless, I will not deny confirmation on that ground because that provision of her

plan is essentially superfluous.  If she cannot refinance under those terms, her 7th Amended Plan

obligates her to sell the property within a limited time.  The 7th Amended Plan also contains the

requisite specificity with respect to the terms under which the Debtor proposes to market and sell

the property, i.e., the Debtor says that she will sign an agreement to sell the Booth Lane Property

for not less than $600,000.   Further, I am satisfied that the option of refinancing and the timeline

for signing an agreement of sale have been properly circumscribed.[64]  Importantly, the plan also

provides that if an agreement of sale is not signed within 180 days after confirmation, the case is

subject to dismissal.  Accordingly, I am satisfied that her plan is workable.  See generally In re

Erickson, 176 B.R. 753 (Bankr. E.D. Pa. 1995) (chapter 13 "sale" plan may be confirmed where

the plan states the terms of and time period for contemplated sale and is specific as to remedies

available to secured creditors if projected sale is unsuccessful).

Consequently, I overrule James' good faith and feasibility objections to confirmation.[65]

---

[64]     The plan specifies the time period within which the Debtor may pursue refinancing
the Booth Lane Property (within 60 days after confirmation) and sale of the property (the Debtor
must sign an agreement of sale within 180 days of confirmation), if refinancing is not possible.

[65]     James also asserted the objection that the Debtor understated the value of her home in
her bankruptcy Schedule A.  He did not develop any evidence at trial proving that at the time the

**C.   The 7th Amended Plan Does Not Comply with 11 U.S.C. §1325(a)(4)**

There is one remaining aspect of the Debtor's plan that requires discussion.

This issue arises from the 7th Amended Plan's provision for a $20,000 payment to James, provided the Debtor is able to refinance the mortgage on the Booth Lane Property as contemplated.[66]  The 7th Amended Plan suggests that this $20,000 might come at the expense of proceeds otherwise due to the unsecured creditors who hold allowed claims.  Because James has filed no proof of claim, no payment can be made to him with assets of the estate that are earmarked for distribution to creditors.  See 11 U.S.C. §1325(a)(4).  Should the Debtor wish to obtain confirmation, she must file an amended plan that either deletes the reference to the $20,000 payment or makes clear that such payment will only be made to James from proceeds that are derived from either (1) the Debtor's exemptions or (2) monies reverting to the Debtor, if any, after payment of all allowed claims provided for under the plan.

---

Debtor filed Schedule A, she materially understated the value of the Booth Lane Property.  In any event, given that the 7th Amended Plan calls for a refinance of the outstanding mortgage loan (which may be very difficult for the Debtor to accomplish, considering her financial circumstance, see Part III.C., infra) or, as is more likely, a sale of the property, the market will determine the value of her Booth Lane Property.  I fail to see how this undeveloped issue establishes that the 7th Amended Plan was not filed in good faith.

[66]   There may be some ambiguity in the 7th Amended Plan on this point, but as I read it, James is to receive the $20,000 payment if the Booth Lane Property is refinanced but not if it is sold.  While it is unlikely that a refinancing will occur, I must consider that possibility when I evaluate the confirmability of the plan.

# IV.  CONCLUSION

_____For the reasons set forth above, I deny the Trustee's Motions to Dismiss, resolve the

separately-filed adversary in the Debtor's favor (finding that the Debtor owns 100% beneficial

interest in the Booth Lane Property), overrule James' objections to confirmation of the Debtor's

7th Amended Plan and deny confirmation of the Debtor's plan with leave to file an Amended

Chapter 13 Plan within a finite period of time.

      An Order consistent with this Opinion will be entered.


**Date:**   __**June 11, 2007**__          _____

                                    **ERIC L. FRANK**
                                    **U.S. BANKRUPTCY JUDGE**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE:**    **KAREN JENSEN** | : | **Chapter 13** |
| | : | |
| **Debtor** | : | **Bky. No. 04-34567ELF** |
| | : | |
| _____ | : | |
| | : | |
| **KAREN F. JENSEN,** | : | |
| **WILLIAM C. MILLER, Trustee** | : | |
| **Plaintiffs** | : | **Adv. No. 05-0530** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES A. FROIO and OPTION ONE** | : | |
| **MORTGAGE CORPORATION,** | : | |
| | : | |
| **Defendants** | : | |
| _____ | : | |

# O R D E R

**AND NOW,** upon consideration of the Debtor's 7th Amended Chapter 13 Plan ("the Plan"), the Trustee's Motions to Dismiss Case ("the Motions"), the Objections to Confirmation of the Plan filed by James Froio ("the Objections"), and after a hearing on the Motions, a hearing on confirmation of the Plan and a trial of the above-captioned adversary proceeding, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** and **DETERMINED** that:

1. The Motions are **DENIED**.

2. The Objections are **OVERRULED**.

3. James Froio's record ownership interest in the condominium unit located at 5 Booth Lane, No. 6, Haverford, PA 19041 is held in a resulting trust in favor of the Debtor and the Debtor is

the sole beneficial owner of that property.

4. Confirmation of the Plan is **DENIED**.

5. The Debtor is **GRANTED LEAVE** to file and serve an 8th Amended Plan within ten (10) days from the entry of this Order.

6. A hearing on confirmation of any 8th Amended Plan which the Debtor may file shall be held on **July 24, 2007  at 1:00 p.m.** in Bankruptcy Courtroom No. 1, U.S. Courthouse, 900 Market Street, 2d floor, Philadelphia, PA 19107.

7. Should the Debtor fail to timely file an amended plan pursuant to ¶5 above, the court will consider dismissal of this bankruptcy case, sua sponte at the July 24, 2007 hearing, pursuant to 11 U.S.C. §1307(c)(1).  E.g., Jablonski v. Internal Revenue Service, 204 B.R. 456, 458 (W.D. Pa. 1996); In re Fricker, 116 B.R. 431, 442 (Bankr. E.D. Pa. 1990); 4 Collier on Bankruptcy ¶1307.04, at 1301-11 (15th rev. ed. 2006).

8. The Clerk shall enter this Order in both the main bankruptcy case (Bky. No. 04-34567) and the adversary proceeding (Adv. No. 05-0530)

Date:    June 11, 2007                        _____

                                              **ERIC L. FRANK**
                                              **U.S. BANKRUPTCY JUDGE**

**Counsel**
David A. Scholl
Attorney for Debtor

James J. Greenfield
Attorney for James Froio

Doreena Craig Sloan
Andrew Eisemann
Attorneys for Mary Drexel Home

Leroy Etheridge
Attorney for William C. Miller, Trustee